# The People of the State of Illinois, Defendant in Error, v. William F. Stine, Plaintiff in Error.

## Gen. No. 21,048.

1. CONSPIRACY, § 50*—*when evidence sufficient to sustain conviction.* Evidence in prosecution for conspiracy to bribe city council and for embezzlement, examined and *held* sufficient to sustain conviction.

2. CRIMINAL LAW, § 520*—*when verdict not set aside on appeal as against weight of evidence.* Verdict in criminal case will not be set aside on review, as against the weight of evidence, unless the evidence clearly gives rise to a well-founded doubt in regard to the guilt of the accused.

3. INDICTMENT AND INFORMATION, § 48*—*when several counts relating to same transaction may be joined in one indictment.* Where

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

several counts relate to one general transaction they may be joined in one indictment even though the transaction, if established as laid in one count, necessarily terminated prior to the time when it would have terminated if the evidence supported another count. .

4. INDICTMENT AND INFORMATION, § 55*—*when within discretion of court to compel election between counts of indictments.* The right of compelling an election between counts of an indictment and time for the exercise of such election lies in the sound discretion of trial court.

5. INDICTMENT AND INFORMATION, § 56*—*when refusal of court to compel election between counts of indictment before trial not erroneous.* Refusal of trial court to compel, before trial, election between counts in an indictment charging conspiracy to corrupt, conspiracy to collect a fund for political purposes, and others charging conspiracy to defraud, conspiracy to embezzle, and embezzlement, where all counts related to one general transaction, *held* not error.

6. INDICTMENT AND INFORMATION, § 54*—*when motion to compel election between counts of indictment too late.* Motion to require election between counts of an indictment comes too late if not made until after verdict.

7. INDICTMENT AND INFORMATION, § 56*—*when within discretion of court to refuse motion to compel election between counts of indictment.* Where there is ample evidence to sustain finding of guilty on each of several properly joined counts of an indictment, it is within discretion of trial court to refuse motion to compel election between such counts.

8. EMBEZZLEMENT, § 18*—*when evidence that money embezzled collected for unlawful purpose admissible.* In a prosecution for embezzlement, evidence that the money embezzled was collected by the defendant for an unlawful purpose is admissible.

9. CONSPIRACY, § 49*—*when evidence as to refusal to return funds collected for the purpose of bribery admissible.* Refusal of one indicted for conspiracy to bribe to return funds collected for that purpose is admissible as tending to show unlawfulness of purpose of such collection.

10. CRIMINAL LAW, § 589*—*when admission of evidence under proper and improper counts not erroneous.* Where, after finding of guilty on charges of both conspiracy to bribe and embezzlement, the latter count is dismissed, the defendant cannot, even if the latter count was improperly submitted, complain of admission of evidence showing embezzlement where such evidence was admissible also on the conspiracy charge.

11. CRIMINAL LAW, § 227*—*when People's case may be reopened to allow introduction of testimony.* After the close of the People's

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

case and before the opening of the defense, the court may reopen the People's case to allow introduction of testimony where the delay in introducing it was not attributable to the People.

12. CRIMINAL LAW, § 227*—*when defendant estopped to complain that his case was interrupted to allow introduction of testimony for People.* Where testimony properly receivable after the close of the People's case and before the opening of the defense is not received at that time because of objection of the defendant, he cannot complain that later his own testimony is interrupted to receive such offered testimony.

Error to the Criminal Court of Cook county; the Hon. CHARLES A. McDONALD, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1915. Affirmed. Opinion filed May 12, 1916.

CHARLES J. TRAINOR, for plaintiff in error.

MACLAY HOYNE and EDWIN J. RABER, for defendant in error; EDWARD E. WILSON, of counsel.

MR. JUSTICE GOODWIN delivered the opinion of the court.

Plaintiff in error seeks to set aside a judgment sentencing him to the penitentiary for five years, entered on a general verdict finding him guilty of conspiracy. The case went to the jury on four counts charging conspiracy to bribe members of the city council, one count charging a conspiracy to obtain money by threats and intimidation, and one, the eighteenth, charging embezzlement of certain moneys belonging to one Lyons and delivered to defendant as bailee. A separate verdict was returned finding him guilty on this embezzlement charge, but afterwards the count was dismissed out of the indictment. The indictment originally consisted of twenty-two counts. Of those dismissed, the sixth charged conspiracy to defraud the City of Chicago by bribing the aldermen to increase the pay of patrolmen, the seventh, eighth, ninth and tenth a conspiracy to collect political assessments con-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

trary to law, the eleventh, twelfth and fourteenth a conspiracy to obtain money under false pretenses and to cheat and defraud, the thirteenth and fifteenth a conspiracy to obtain money by means of the confidence game, the sixteenth a conspiracy to embezzle, while the seventeenth and nineteenth charged embezzlement, and the twentieth, twenty-first and twenty-second charged obtaining money by the use of the confidence game.

The evidence disclosed that the defendant, a patrolman, was president of an organization known as the "United Police," which embraced all ranks in the police department, although each rank constituted a separate division with its own committee. The patrolmen's committee, of which defendant was an honorary or *ex officio* member, consisted of a representative from each of the forty-five or forty-six police precincts in the city. It further appears that in 1910, after an unsuccessful effort had been made to secure from the city council an increase in the salary of patrolmen, a meeting of the patrolmen's committee was held some time in May at which it was decided, at the instigation of defendant, that an attempt should be made to collect $20 from as many as possible of the 4,000 patrolmen. For that purpose envelopes were distributed upon which was printed:

"Referendum Vote—Patrolmen only. Questions 4 and 5—Pensions. Place vote within this carton, seal and return to Patrolmen's Committee, not later than June 15, 1910. Carefully note the number of this Carton."

These envelopes or cartons were numbered serially. A committee of three, one from each division of the city, was appointed to secure the collections. As one member died, the matter was left to the other two— defendant and one Carney. The contributions were made by putting $20 in an envelope and sealing it. No receipt was given, but the name of the patrolman was apparently checked upon a list. When the money was

turned over to defendant and Carney, the envelopes were destroyed. By October a considerable sum of money was collected, but there is some variance in the evidence as to the amount. Defendant said it was $25,000, Carney said $36,000, while other testimony indicated that it was $42,000 or more. This money was kept in a safety deposit box, secured by the defendant under a fictitious name, until some time in October, when defendant and Carney divided it, and each placed his half in a separate vault. When, in February 1911, the city council passed an appropriation bill which left the salary of patrolmen unchanged, the contributors to the fund, for the first time, began to demand the return of their money. Defendant, who had been on a furlough for six months, allowed from time to time upon his false statement that he wished to take treatment for catarrh, dictated a letter at Springfield, April 5th, addressed to the superintendent of police, submitting his resignation, to take effect April 15th.

At the last meeting of the patrolmen's committee, which was held in May, 1911, defendant was present and stated he was ready to return the money, but must know how much each precinct had contributed. When this information was given, he and Carney were to go to the vault. They left the hall, but did not return.

Defendant stated that he resigned from the police department to take a position with a sugar beet company, secured for him by his brother-in-law, and worked in that position about five months, but not continuously. The only evidence upon this subject was his own testimony, which was neither plausible, convincing, nor in harmony with the fact that after his resignation he spent practically all of his time on his farm in Michigan. Had he actually been employed by a sugar company, as he testified, there would, no doubt, have been ample corroborating evidence of that fact. He says he took his family to Kansas City

March 22nd, was in New Orleans April 1st, Springfield April 2nd; that on March 15th, the men had demanded their money back; that he had it with him at the meeting, but men were demanding it who had no right to it. It clearly appears, however, that he never returned or accounted for any part of the money collected. Testimony was offered on behalf of the People as to statements made by defendant and his associates at the meeting at which the plan for raising the money was adopted and at other times, which, if true, established it as a fact that the money was collected for the purpose of bribing the city council to increase the pay of patrolmen from $1,200 to $1,400 a year.

From the conduct of the defendant it may fairly be inferred that from the beginning it was also his purpose to embezzle a portion or all of the money collected and rely upon the incriminating character of the enterprise as protection against complaints by his associates.

There is also clear and explicit testimony tending to show that in many cases the contributions were not voluntarily given, but were made because of the power wielded by the committee. It further appears that after defendant had left the State, one of the collectors, Lyons by name, followed him to Michigan and demanded the return of the money collected in his precinct, and that defendant refused to surrender it.

The testimony on the part of the prosecution establishing both the crimes of conspiracy and embezzlement was direct and convincing.

By way of defense, defendant testified that changes in the pension law were being agitated in the police department, and that there were a number of questions in regard to the proposed changes; that he desired to have a referendum submitted upon questions four and five, and prepared the envelopes or cartons for that purpose; that this purpose was abandoned, and that the envelopes were used to collect the money; that the

money was raised to secure the passage of such favorable pension legislation as the patrolmen's committee or the patrolmen might decide upon.

To explain the necessity for funds for this purpose, when the United Police, of which he was president, had several thousand dollars in its treasury, he said that it was not known whether all ranks in the United Police would agree to such changes as the patrolmen might desire. It was admitted, however, that at a meeting of the various ranks of the United Police held in December, prior to the convening of the Legislature, all agreed upon a program, and that the expense incurred in securing these changes in the pension law was defrayed out of the treasury of the United Police.

Upon an examination of the evidence offered by the defendant we are unable to discover what plan or idea in regard to changes in the pension law the men responsible for the collection of the fund in question had in mind, and nowhere in the record does it appear that the patrolmen as a body ever declared themselves in favor of any particular changes or feared any changes advocated by any one else, but, on the contrary, it appears from defendant's own testimony that there were conflicting interests in the ranks of the patrolmen themselves, so far as the matter of pensions was concerned. Nevertheless, according to his testimony, a sufficient number were found who were willing to contribute enough to create the fund in question, and without any definite information as to what changes in the pension law it was to be used to secure.

Defendant's statement that it was not intended to raise a fund of such size as the one in question, but only a fund of from $6,000 to $7,000 is not credible, in the absence of any effort to check the continued collection of the fund, although it must have exceeded the sum of $7,000 months before the collection ceased to be made; but, on the contrary, the evidence discloses vigorous efforts to increase the fund after it had

grown to be several times the size of the fund which defendant says was intended.

Defendant's testimony that the fund was raised for the purpose of securing pension legislation is further discredited by the fact that although the United Police, which had ample funds to defray the necessary expenses in connection with such legislation, had agreed upon a legislative program satisfactory to the patrolmen as early as December, there is not one particle of evidence that anybody suggested the return of any portion of the money collected, until after the city council, in February, 1911, had passed an appropriation ordinance fixing the patrolmen's salaries for the ensuing year, and the further fact that thereupon contributors began to clamor for a return of their money.

Counsel for defendant contends that many witnesses called by the People testified that the fund was not raised for the purpose of bribing aldermen. We feel that counsel has misconceived the effect of their testimony. They very definitely and positively testified that the money was collected for the purpose stated, but some of them were naturally reluctant to say that they actually gave the $20 with a knowledge that it was to be used for the purpose of bribery. Upon this branch of the case it is sufficient to say that the evidence cannot be examined without a conviction that this money was raised with the known and declared purpose of using it to secure an increase in the salary of patrolmen by corrupting members of the city council, and that that purpose was well and generally known, although the evidence is clear that a large number who contributed did so unwillingly and as the result of coercion.

The evidence of embezzlement charged in the eighteenth count, upon which a verdict of guilty was also returned, is equally clear.

Upon the question of the weight of the evidence it may be remarked that it is not within the province of

this court to set aside a verdict in a criminal case unless the evidence clearly gives rise to a well-founded doubt in regard to the guilt of the accused (*People v. Crosenheider*, 266 Ill. 324), and we are of the opinion that no such doubt arises from an examination of the evidence in this case.

Counsel for defendant also contends that the trial court erred in refusing to quash the indictment or compel the State's Attorney before the trial to elect as to whether he would proceed to trial upon the counts charging conspiracy to corrupt, conspiracy to collect a fund for political purposes, or the counts charging conspiracy to defraud, conspiracy to embezzle, and embezzlement. It is apparent, however, from a reading of the counts themselves, that they all relate to one general transaction, and are properly joined to meet the various phases that might be disclosed by the evidence. To illustrate the necessity as well as the propriety of such a practice it may be said that while it was very clear from the evidence apparently in the possession of the People that the transactions constituted a conspiracy, it might not have been known at the outset whether the sum raised was intended to be used for the purpose of bribing members of the city council, or to intimidate them by threats to use the funds in support of opposing candidates, or whether it might not appear that from the beginning it was the intention of the defendant to collect a fund under the pretense that it was to be used for the purpose of influencing the city council, and then to take advantage of the incriminating character of the transaction to protect him in embezzling it. The practice complained of is fully supported by the authorities.

The fact that the transaction, if established as laid in one count of the indictment, necessarily terminated at a point in time prior to the time when it would have terminated if the evidence supported some other count in the indictment, is quite immaterial. In *People v.*

*Dougherty,* 246 Ill. 458, an indictment was supported which charged in one count the forging of an instrument, and in another the passing of the instrument so forged. In that case the court said that: "Even if it were not apparent upon the face of each of these indictments that the several counts relate to the same transaction, in the absence of anything to show the contrary it would be presumed that the charges contained in each count related to the same transaction." (See also, *West v. People,* 137 Ill. 189.)

The right of compelling an election is, moreover, in the sound discretion of the court, and, if proper at all, the time when it should be required must be left to the discretion of the presiding judge. (*Schintz v. People,* 178 Ill. 320.) In view of what has been said, it is very clear that the court, in refusing to require an election before the trial, did not err.

Counsel for defendant insists, however, that at the close of all the evidence the court should have required the People to elect whether they would proceed under the five remaining counts charging conspiracy, or the count charging embezzlement. It is a complete answer to this to say that while counsel for defendant submitted seven distinct motions at the close of all the evidence, he did not submit or make any motion to require an election until the matter came on for hearing on a motion for a new trial, at which time he presented a motion in writing and asked that it be considered filed *nunc pro tunc* as of the date of the trial. He did call the matter to the attention of the court, but did not ask for an election. A portion of the record abstracted is as follows:

Mr. Trainor: "Then comes the question of embezzlement under the eighteenth count as below. You (addressing the court) said the other day if nothing further developed to renew the motion.

"Now certainly nothing has developed that strengthens the State's position in that regard. The question cannot be raised in the first instance of bribing the city

council, and at the same time of embezzling from the men."

Mr. Malato: "Now, if the court please, we are going to ask the court to rule in favor of the defendant on the proposition of embezzlement, leaving only conspiracy to bribe the city council.

The Court: "What about the question of embezzlement? Don't you think there is evidence supporting the charge of embezzlement?"

Mr. Malato: "There is, but—"

The Court: "If you wish to *nolle* as to that I won't take any responsibility."

The record itself discloses that thereupon Mr. Malato asked:

"What is the motion of counsel at this time?"

The Court: "He has first asked that the court dismiss as to the first five counts in the indictment. Is that correct?"

Mr. Trainor: "That is correct, your Honor."

The Court: "And those are the ones that charge conspiracy to bribe the city council, a conspiracy to obtain money, for the purpose of obtaining money, is that in substance what they charge?"

Mr. Trainor: "Well, I suppose so."

The Court: "What has the State to say about that?"

Mr. Malato: "About conspiracy?"

The Court: "To obtain money to bribe the city council."

Mr. Malato: "There is ample evidence, not only, Nelligan, Blanchard and other witnesses."

The Court: "The motion to dismiss as to the first five counts will be overruled."

Mr. Trainor: "Exception."

Then followed these seven written motions asking the court to direct a verdict on each of the six counts, and a separate motion to find defendant not guilty on the eighteenth count charging embezzlement, on the ground of a fatal variance between the material allegations and the evidence. The State's Attorney definitely asked counsel for defendant to make his motion, and as the latter failed to make any motion asking an

election, he waived his right to have an election made if any such right existed.

But we are further of the opinion that had a motion asking an election been properly presented at that time, it was still within the discretion of the court to refuse to allow it, for there was ample evidence to sustain a finding by the jury that defendant was guilty of the conspiracy charges and a finding that he was guilty of the embezzlement charge. It was possible that if the court required an election, there might be withdrawn from the jury the very count charging the offense of which the jury might be convinced that he was guilty. The propriety of the action of the court in submitting the case to the jury on all six counts is fully sustained by the authorities already cited. Moreover, were an election technically proper, the defendant was not harmed by submitting the case to the jury on both charges. The complaint of the defendant is that by trying the case upon the counts charging embezzlement and the operation of the confidence game, there was admitted into the record evidence that would not properly have been admitted under the conspiracy counts, and that by submitting the case to the jury upon the embezzlement count as well as the conspiracy counts, there was retained in the record prejudicial evidence not properly admissible in support of the former. There is a short and, we think, conclusive answer to this contention. It is clear that in support of the charge of embezzlement the People had the right to offer in evidence, every circumstance connected with the process by which the money came into the defendant's hands, for the purpose of determining whether the action of the defendant in retaining it constituted embezzlement or not, and also for the purpose of corroborating the direct testimony of the complaining witnesses, for men do not, in the usual course of things, boldly and defiantly embezzle money coming into their hands for a lawful purpose especially where the embezzlement would be known to hundreds of men,

and, consequently, evidence tending to show that the money was held in such circumstances as to give the defendant some immunity against prosecution, was material in that it tended to show the probability of the testimony establishing embezzlement. On the other hand, the conduct of the defendant in refusing to return any part of the funds in his hands directly corroborated the testimony in regard to the purpose for which it was collected. The very fact that he pocketed thousands of dollars belonging to others tends to show that the money had been collected in such incriminating circumstances as to insure the defendant, in some measure at least, against prosecution, and, therefore, this evidence in regard to his retention of the money after the purpose of the conspiracy had failed, tends to support the direct testimony offered in regard to the unlawful purpose for which it was collected, and would have been properly admissible even though the case had gone to trial upon the first five counts of the indictment alone. The bare fact that a verdict was returned on the embezzlement charge did not harm defendant as no judgment was entered on it.

Counsel for defendant also contends that the defendant's rights were prejudiced by the action of the court in calling the witness Carney and interrupting the defendant's own testimony to permit him to testify. Carney had been called by the court while the People's case was being put in, and, upon his refusal to answer questions, was committed for contempt. Before the defendant went on the stand, Carney indicated to the court that he was willing to testify, but when called, defendant's counsel objected on the ground that the People's case had been closed. We think it was proper for the court to allow, and that it should have allowed the People's case to be reopened at that time for the purpose of receiving the testimony of the witness Carney, since the delay was in no way attributable to the People. The fact that Carney's testimony was not

heard until after the defendant went upon the stand was due entirely to the action of defendant's counsel in objecting to it when Carney was first recalled, and he is, therefore, not in a position to complain. We are, however, of the opinion that the action of the court in receiving the testimony of Carney at the time when it was received, was, in any view of the matter, within the sound discretion of the court.

As we find no reversible error in the record, the judgment of the trial court must be affirmed.

*Affirmed.*